**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Hawkes Co., Inc., Pierce Investment Co.,
and LPF Properties, LLC,

                    Plaintiffs,

          v.

United States Army Corps of Engineers,

                    Defendant.

**MEMORANDUM OPINION**
**AND ORDER**
Civil No. 13-107 ADM/TNL

_____

Gregory R. Merz, Esq., and Nancy Quattlebaum Burke, Esq., Gray Plant Mooty Mooty &
Bennett, PA, Minneapolis, MN, on behalf of Plaintiffs.

Daniel R. Dertke, Esq., United States Department of Justice, Washington, D.C., Friedrich A.P.
Siekert, Esq., United States Attorney's Office, Minneapolis, MN, and Molly McKegney Hunt,
Esq., United States Army Corps of Engineers, St. Paul, MN, on behalf of Defendant.

_____

## I.  INTRODUCTION

On July 9, 2013, the undersigned United States District Judge heard oral argument on

Defendant United States Army Corps of Engineers' (the "Corps") Motion to Dismiss [Docket

No. 11].  Plaintiffs Hawkes Co., Inc. ("Hawkes"), Pierce Investment Co. ("Pierce"), and LPF

Properties, LLC ("LPF") filed this action seeking a declaratory judgment and injunctive relief to

challenge a jurisdictional determination made by the Corps under the Clean Water Act

("CWA").  For the reasons stated herein, the Corps' motion is granted.

## II.  BACKGROUND

Plaintiffs Pierce and LPF own a 530 acre parcel of land in Marshall County, Minnesota

(the "Property").  The Property contains peat, and because peat forms in wetlands, the Property

is necessarily considered a wetland.  Am. Compl. [Docket No. 7] ¶¶ 6, 7, 27.  Plaintiff Hawkes

seeks permission to mine peat from the Property for use in the construction of golf greens.

Hawkes is already mining peat from nearby land, and intends to pay royalties to Pierce and LPF

in exchange for permission to expand its mining operation onto the Property. All three

companies are closely-held corporations owned by members of the Pierce family, and Kevin

Pierce is an officer in all of the companies. Id. ¶¶ 8, 32-33.

On March 20, 2007, Kevin Pierce, representing Hawkes, met with the Corps and the

Minnesota Department of Natural Resources ("MDNR") to discuss Hawkes' plan to mine peat

on the Property. On January 15, 2008, the parties met again. At this second meeting, Hawkes

informed the Corps and MDNR that the high quality peat available on the Property could support

Hawkes' mining operation for another 10 to 15 years. Id. ¶¶ 35-37.

The CWA prohibits the discharge of materials into "navigable waters," which is broadly

defined as "waters of the United States." 33 U.S.C. §§ 1251(a), 1311(a), 1362(6). The Corps

has interpreted the term "waters of the United States" to include wetlands adjacent to navigable

waters. The Supreme Court has affirmed this interpretation. See 33 C.F.R. § 328.3; United

States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 139 (1985). The Corps has authority

under the CWA to issue permits for the discharge of dredged or fill materials into navigable

waters, including wetlands. See 33 U.S.C. § 1344. The Corps has also promulgated regulations

which govern its decisionmaking processes in connection with CWA permits. See 33 C.F.R. §

320.1, et seq.

Hawkes' intended mining operation involves the filling or discharge of materials onto the

Property. As a result, in December 2010, Hawkes applied for a permit from the Corps to begin

mining. In January 2011, the parties met to discuss Plaintiffs' plans. The Corps attempted to

dissuade Plaintiffs from expanding their mining operations, in part by stressing the time and cost

involved in the permitting process. Am. Compl. ¶ 40.

On March 15, 2011, the Corps by letter informed Hawkes it had tentatively determined

that the Property was connected to Red River of the North, a "water of the United States," and

thus regulated by the Corps under the CWA. Over the next several months, the parties met

several times, and the Corps conducted a site visit of the Property. In connection with the

permitting process, the Corps also requested Plaintiffs conduct a series of assessments relating to

the Property, which Plaintiffs estimate will cost about $100,000. Am. Compl. ¶¶ 41-46, Exs. A,

B.

On November 8, 2011, the Corps sent Plaintiffs a preliminary version of its jurisdictional

determination for the Property (sometimes referred to as the "JD"). The preliminary JD stated

that CWA jurisdiction existed over the Property because it was a wetland connected to a

"relatively permanent water," which in turn connected to the Red River of the North, a navigable

water.[1] Plaintiffs responded by letter, arguing no jurisdiction existed because the Property did

---

[1] For jurisdiction to exist under the CWA, the wetland at issue must have some
connection to a "traditionally navigable water." The nature of this connection is somewhat in
dispute due to Rapanos v. United States, 547 U.S. 715 (2006). In Rapanos, the four-justice
plurality opinion held that for jurisdiction to exist under the CWA, the wetland must connect to a
traditionally navigable water by "relatively permanent, standing or continuously flowing bodies
of water." Id. at 739. Justice Kennedy, in a concurring opinion, wrote that jurisdiction exists if
the wetland has a "significant nexus" to traditional navigable waters. Id. at 778; see also Solid
Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs, 531 U.S. 159 (2001).
    The Eighth Circuit Court of Appeals has held that either test can establish CWA
jurisdiction. United States v. Bailey, 571 F.3d 791, 799 (8th Cir. 2009). The Environmental
Protection Agency and the Corps have similarly issued informal guiding documents in which
they have stated an intent to exercise jurisdiction under both tests. See U.S. Army Corps of
Engineers, Clean Water Act Jurisdiction Following U.S. Supreme Court's Decision in Rapanos
(Dec. 2, 2008), available at http://www.usace.army.mil/Portals/2/docs
/civilworks/regulatory /cwa_guide/cwa_juris_2dec08.pdf.

not connect to a "relatively permanent water." Am. Compl. ¶ 49.

On February 7, 2012, the Corps issued an Approved Jurisdictional Determination (the "Approved JD") in which it apparently abandoned the "relatively permanent water" rationale and instead concluded a "significant nexus" existed between the Property and the Red River of the North. An "approved jurisdictional determination" is the first formal decision the Corps makes with regard to jurisdiction, and it is appealable to a "Review Officer" within the agency. See 33 C.F.R. §§ 331.2, 331.3.

On April 4, 2012, in accordance with CWA regulations, Plaintiffs appealed the Approved JD to the designated Corps Review Officer. Am. Compl. ¶ 51. On October 24, 2012, the Corps issued an appellate decision in which it rejected several of the Plaintiffs' appeal arguments. However, the appeal concluded that the Corps had failed to evaluate the Property's chemical, physical, and biological effects on the Red River of the North, and thus had not established a significant nexus. As a result, the JD was remanded to the St. Paul District of the Corps for further factfinding. Id. at Ex. C.

On December 31, 2012, the Corps issued a Revised Approved Jurisdictional Determination (the "Revised JD") in which it again concluded CWA jurisdiction existed. Id. at ¶ 54. The Corps informed Plaintiffs that the Revised JD constituted the "final Corps approved jurisdictional decision," meaning no further appeals of jurisdiction could be taken. Cameron Decl. [Docket No. 13] Ex. 1. On January 11, 2013, Plaintiffs filed this action seeking review of the Revised JD.

## III.  DISCUSSION

### A.  Motion to Dismiss Standard

Rule 12 of the Federal Rules of Civil Procedure states that a party may move to dismiss a

complaint for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).

The court construes the pleadings in the light most favorable to the nonmoving party, and the

facts alleged in the complaint must be taken as true.  Hamm v. Groose, 15 F.3d 110, 112 (8th

Cir. 1994) (citation omitted).  And although the court may not consider matters outside the

pleadings at this stage, "documents necessarily embraced by the complaint are not matters

outside the pleading[s]."  Ashanti v. City of Golden Valley, 666 F.3d 1148, 1151 (8th Cir. 2012)

(quotation omitted).

### B.  Review of Final Agency Actions

Under the Administrative Procedure Act (APA), "agency action made reviewable by

statute and final agency action for which there is no other adequate remedy in a court are subject

to judicial review."  5 U.S.C. § 704.  For an agency action to be considered "final," it must

satisfy two conditions.  First, the action must "mark the consummation of the agency's

decisionmaking process," meaning it must be more than "tentative or interlocutory" in nature.

Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (quotations and citations omitted).  Second, the

action must be one "by which rights or obligations have been determined," or one from which

"legal consequences will flow."  Id. at 178.

The parties do not dispute that Plaintiffs here could obtain judicial review by pursuing the

permitting process, as Corps regulations expressly make the final permit decision reviewable

under the APA.  See 33 C.F.R. § 331.12.  However, Plaintiffs argue that by itself, a jurisdictional

determination qualifies as a "final agency action" subject to immediate judicial review.

**C. Judicial Review of Jurisdictional Determinations**

Although no Eighth Circuit court has yet ruled on the issue, several other federal courts have held that a jurisdictional determination is not a "final agency action," and thus not subject to immediate judicial review. See, e.g., Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs, 543 F.3d 586 (9th Cir. 2008); Greater Gulfport Props., LLC v. U.S. Army Corps of Eng'rs, 194 F. App'x 250 (5th Cir. Aug. 23, 2006) (unpublished); Coxco Realty, LLC v. U.S. Army Corps of Eng'rs, No. 3:06-cv-416-s, 2008 WL 640946, at *4-5 (W.D. Ky. Mar. 4, 2008); Hampton Venture No. One v. United States, 768 F. Supp. 174, 175-76 (E.D. Va. 1991); St. Andrews Park, Inc. v. U.S. Dep't of Army Corps of Eng'rs, 314 F. Supp. 2d 1238, 1244-45 (S.D. Fla. 2004); Child v. United States, 851 F. Supp. 1527, 1534-35 (D. Utah 1994); Lotz Realty Co. v. United States, 757 F. Supp. 692, 695-98 (E.D. Va. 1990); Acquest Wehrle LLC v. United States, 567 F. Supp. 2d 402, 409-411 (W.D.N.Y. 2008); Belle Co., LLC v. U.S. Army Corps of Eng'rs, No. 12-247-BAJ-SCR, 2013 WL 773730, at *2-4 (M.D. La. Feb. 28, 2013).

Fairbanks illustrates the above-cited cases' reasoning for denying judicial review of jurisdictional determinations. Like Plaintiffs in this case, the plaintiff in Fairbanks sought judicial review after the Corps issued an approved jurisdictional determination for the wetlands at issue. Fairbanks, 543 F.3d at 593-94. In deciding whether a jurisdictional determination is a "final agency action," the Ninth Circuit Court of Appeals found that while the first Bennett condition was satisfied, the second was not. The court also concluded that the jurisdictional determination did not impair the plaintiff's ability to seek judicial review through the permitting process. See Bennett, 520 U.S. at 177-78; 5 U.S.C. § 704.

Considering the first Bennett condition, the Ninth Circuit held that the plaintiff's jurisdictional determination represented a consummation of the Corps' decisionmaking process. The court reasoned that when the Corps issues a jurisdictional determination and upholds it on administrative appeal, the Corps itself treats the determination as "final" and will not reopen it absent new information supporting a revision. Fairbanks, 543 F.3d at 592. The Ninth Circuit also found that Corps regulations treat the jurisdictional determination as a separate administrative process from the subsequent permit decision, with the latter being initiated at-will by the permit applicant. Practically speaking, when an applicant requests a permit, his application does not reopen or otherwise disturb the Corps' earlier jurisdiction decision. Id. at 593. As a result, the Fairbanks court held that the jurisdictional determination satisfied the first Bennett condition.

However, the Ninth Circuit ultimately held that a jurisdictional determination was not a "final agency action"—and thus not subject to immediate judicial review—because it did not alter a party's rights or obligations. See id. at 591-94. A jurisdictional determination, the court held, "does not itself command [a party] to do or forbear anything; as a bare statement of the agency's opinion, it can be neither the subject of 'immediate compliance' nor of defiance." Id. at 591-92 (citation omitted). A finding of jurisdiction in this context, the court held, is akin to recognizing already-existing facts about the nature of the wetlands at issue. When the Corps finds jurisdiction, it "does not alter physical reality or the legal standards used to assess that reality." Id. at 594. In other words, the Corps' jurisdictional determination clarifies a plaintiff's position but does not alter it. As a result, the jurisdictional determination fails the second Bennett condition, and the determination is not subject to judicial review.

As part of its analysis, the Ninth Circuit briefly noted its holding did not impair the

plaintiff's ability to challenge CWA jurisdiction. Id. at 594-95. The plaintiff could still

challenge jurisdiction when judicial review was appropriate, such as in connection with a permit

application or an enforcement proceeding. See id. As a result, the plaintiff was not without

"other adequate remedy in a court." See id.; 5 U.S.C. § 704.

**D.  Plaintiffs' Appeal of the Revised Jurisdictional Determination**

As discussed below, Plaintiffs' jurisdictional determination satisfies the first Bennett

condition, but not the second.

**1.  Consummation of the Agency's Decisionmaking Process**

The Corps argues Fairbanks reached the correct end result, but disagrees with the Ninth

Circuit's conclusion that a jurisdictional determination marks the consummation of the agency's

decisionmaking process. Instead, the Corps urges the Court to view jurisdictional determinations

as the beginning, or at least as some non-definitive, stage of the permit process. In response,

Plaintiffs note that Fairbanks, a case on which the Corps relies, held that a jurisdictional

determination was the consummation of a Corps decisionmaking process. Plaintiffs further

argue the language of Corps regulations themselves indicate an intent to treat jurisdictional

determinations as final.

Plaintiffs' jurisdictional determination marked the consummation of the Corps'

decisionmaking process, and as such satisfies the first Bennett condition. Despite the Corps'

argument to the contrary, the jurisdictional determination process is not—as this case

demonstrates—necessarily contiguous with a permit application process. Here, Plaintiffs

received the Revised JD but have not yet decided whether to pursue a permit. At this point,

8

Plaintiffs could choose to abandon their mining operation. If that were to occur, Plaintiffs would not have abandoned the administrative process at a midpoint. The Corps' jurisdictional determination would remain in place regardless of future operations, changes in ownership, or complete inactivity on the Property. The only ways in which the Revised JD could be altered would be if: (1) new information surfaced regarding the Property, or (2) a party later successfully challenged jurisdiction in connection with a permit application or enforcement action. The jurisdictional determination is thus a discrete decision.

The possibility of the Corps revising its jurisdictional determination does not, as the Corps urges, transform this determination into an advisory opinion. The Ninth Circuit in Fairbanks concluded that the possibility of new information arising did not suggest that the determination "might be subject to subsequent revision . . . consideration or modification." Fairbanks, 543 F.3d at 592 & n.4; see also Coxco, 2008 WL 6490946, at *5 (holding jurisdictional determination may mark consummation of jurisdiction decisionmaking process). In other administrative and judicial contexts, a final decision may be reopened if new information comes to light. See, e.g., Fed. R. Crim. P. 33(b)(1) (governing motion for new trial based on newly discovered evidence); 20 C.F.R. § 404.989 (allowing for reopening of otherwise final Social Security benefits decisions based on new evidence or showing of error). But, for very practical and equitable reasons, the chance of new information altering a final decision does not justify treating the decision as entirely advisory. That is also the case here.

The language of Corps regulations further supports this conclusion. The Corps concedes CWA regulations describe a jurisdictional determination as "a Corps final agency action." 33 C.F.R. § 320.1(a)(6). However, the Corps argues that this language does not mean the Corps

views jurisdictional determinations as final for APA purposes, but rather only as "final" in the

sense the public may rely on the determination.[2]  See Final Rule for Regulatory Programs of the

Corps of Engr's, 51 Fed. Reg. 41,206, 41,207 (Nov. 13, 1986).  The Corps' argument, as

Plaintiffs note, actually supports viewing jurisdictional determinations as the consummation of a

decisionmaking process.  If a jurisdictional determination is "final" in the sense the public may

rely on it, the determination must be more definitive than an advisory opinion.

### 2.  Determines a Party's Rights or Obligations

Although Plaintiffs' Revised JD may mark the consummation of a Corps'

decisionmaking process, it does not determine Plaintiffs' rights or obligations, and thus does not

satisfy the second Bennett condition.  Plaintiffs argue Bennett stressed the practical nature of its

articulated finality test, focusing on the legal consequences of the agency decision even if the

decision itself did not expressly alter legal rights.  See Bennett, 520 U.S. at 169-70.  Because the

Corps has found jurisdiction, Plaintiffs argue, their options have narrowed to a set of difficult

alternatives.  Plaintiffs may proceed with mining and risk substantial liability; they may seek a

permit through a lengthy and costly process; or they may abandon their mining plans altogether.

As a result, Plaintiffs argue the Revised JD has materially altered their legal position.  The Corps

responds by arguing, as Fairbanks held, that jurisdictional determinations do not alter a party's

legal obligations so much as mark the boundaries for future decisions.

Plaintiffs' jurisdictional determination does not fix their rights or obligations.  The

Revised JD does not order Plaintiffs to take any kind of action.  Although Plaintiffs may want to

---

[2]  This argument also reflects the overall regulatory scheme, as 33 C.F.R. § 331.12 states administrative remedies have not been exhausted for APA purposes until a final permit decision is reached under § 331.10.

obtain a permit if they wish to expand their mining operations, the Corps has in no way obligated

them to do so.  See Fairbanks, 543 F.3d at 594; St. Andrews, 314 F. Supp. 2d at 1244-45; Belle,

2013 WL 773730, at *4.  While Plaintiffs do have a difficult choice to make regarding how to

proceed, their options did not substantially change because of the jurisdictional determination.

The Property is undisputedly a wetland, and it has a potential connection to a navigable water.

The Revised JD did not change these physical characteristics.  Nor did it affect the legal

standards used by agencies and courts in determining where the CWA applies.  Even if Plaintiffs

had never approached the Corps, Plaintiffs would have still needed to decide whether to begin

mining on a wetland possibly protected by the CWA or to pursue a permit.  As a result, the

Revised JD does not satisfy the second Bennett condition.

**E.  Compliance Orders and Sackett**

Neither Plaintiffs nor the Court have identified a single decision contrary to the holding

of Fairbanks and the other cases cited above.  However, Plaintiffs argue the Supreme Court's

recent holding in Sackett v. EPA, 132 S. Ct. 1367 (2012), overruled these decisions.[3]  Without

obtaining a jurisdictional determination or permit, the petitioners in Sackett filled rocks and dirt

onto part of their residential lot in preparation for building a house.  In response, the EPA issued

a compliance order in accordance with 33 U.S.C. § 1319.[4]  In the compliance order, the EPA

---

[3]  The Court in Belle, 2013 WL 773730, at *4, specifically distinguished Sackett, holding
jurisdictional determinations did not have the binding effect of compliance orders.  Nevertheless,
Plaintiffs argue Belle reached the wrong result, and that Sackett applies here.

[4]  The EPA and the Corps have concurrent jurisdiction to enforce the CWA.  The EPA
has the authority under the Act to issue compliance orders, binding decisions which the EPA can
then choose to enforce in court by bringing an enforcement action.  See 33 U.S.C. §§ 1319(a),
(b).  Prior to Sackett, courts had held that a party subject to a compliance order had no judicial
recourse until the EPA brought a civil action to enforce the order.  See, e.g., Hoffman Grp. v.

determined that the petitioners' property fell under CWA jurisdiction, and also that the

petitioners had violated the Act.  Id. at 1370-71.  The petitioners sought review of the

compliance order, arguing it was a "final agency action" under Chapter 7 of the APA and thus

subject to judicial review.

The Supreme Court sided with the petitioners.  The Court held the compliance order bore

the hallmarks of a "final agency action" under the two Bennett conditions.  First, the compliance

order marked the consummation of the EPA's decisionmaking process, because the petitioners

were not entitled to any further administrative review.  Id. at 1372.  Second, the compliance

order determined the petitioners' rights and obligations.  The order legally obligated the

petitioners to "restore" their land in accordance with an EPA restoration plan, it required them to

provide the EPA with access to the property, and it required them to provide EPA employees

with "access and documentation related to the conditions of the site."  Id. at 1371 (citation

omitted).  If the petitioners did not comply, they would immediately risk accruing substantial,

daily penalties.  Id. at 1372.  In addition, the Court noted that Corps regulations made it

substantially more difficult for the petitioners to obtain a permit after receiving a compliance

order.  Id. (citing 33 C.F.R. § 326.3(e)(1)(iv)).

### 1. **Bennett Conditions Under Sackett**

Plaintiffs argue the Revised JD satisfies the same criteria for a "final agency action" as

the compliance order reviewed by the Supreme Court in Sackett.  As a result, Plaintiffs argue the

Court should extend Sackett's holding to apply to all final CWA jurisdictional determinations as

well.  The Corps responds that Fairbanks and the other above-cited cases have correctly stated

---

EPA, 902 F.2d 567, 569-70 (7th Cir. 1990).

the law, and that because jurisdictional determinations are distinguishable from compliance

orders, Sackett should have no effect here.  Plaintiffs are unable to demonstrate how Sackett

applies to jurisdictional determinations.

As discussed above, the jurisdictional determination satisfies the first Bennett condition.[5]

With regard to the second Bennett condition, however, Plaintiffs' Revised JD is distinguishable

from the petitioners' compliance order in Sackett.  The compliance order demanded the

petitioners restore their property in accordance with a restoration plan set by the EPA, and grant

the EPA access to both the land and records at issue.  Sackett, 132 S. Ct. at 1371-72.  If the

petitioners chose to disobey the compliance order, they risked accruing up to $75,000 per day in

penalties, which the EPA could recover if it subsequently prevailed in an enforcement action.  Id.

at 1370.

As discussed above in Section III.D.2., Plaintiffs face no such obligations or changes in

their rights as a result of their jurisdictional determination.  Plaintiffs attempt to avoid this

conclusion by arguing the threat of liability comprises a material change in their legal

obligations, just as it did for the petitioners in Sackett.  See Sackett, 132 S. Ct. at 1371.  If

Plaintiffs forgo the costly permit process and begin mining, they argue, they will face the risk of

the Corps suing them.  However, the compliance order in Sackett "started the clock" on the

petitioners' exposure to liability, adding potentially tens of thousands of dollars per day in

_____

[5]  Regarding the first Bennett condition, Sackett and Fairbanks actually adopt the same
reasoning in concluding a compliance order and a jurisdictional determination mark the
consummations of their respective decisionmaking processes.  Sackett held the "mere
possibility" of an agency revisiting and revising its original decision based on new information
does not "suffice to make an otherwise final agency action nonfinal."  Sackett, 132 S. Ct. at
1372.  As discussed above, Fairbanks held in agreement on this point.

penalties pending restoration of the property.  See id.  In this case, the jurisdictional

determination has not exposed Plaintiffs to liability, nor made any demands of them.  And if an

enforcement action was brought against them, Plaintiffs would not face substantial—and

automatically accrued—liability for their actions.[6]  Thus, the "specter of potential liability" was

much more concrete for the petitioners in Sackett than it is here.  Pls.' Mem. Opp. [Docket No.

26] 23; see Lotz, 757 F. Supp. at 696 (holding the permitting process did not impose the sort of

"immediate and devastating consequences" which might amount to a determination of rights or

obligations).

Also unlike the petitioners in Sackett, Plaintiffs may pursue a permit without a

disadvantage.  The compliance order "severely" limited the petitioners' ability to obtain a permit

from the Corps.  Sackett, 132 S. Ct. at 1372.  Here, the jurisdictional determination has not

affected Plaintiffs' ability to pursue a permit.  And Plaintiffs' description of the permit process as

an unending, unreasonably expensive procedural nightmare is unpersuasive.  Undoubtedly,

pursuing a permit comes at a significant price, and it will take time before Plaintiffs may

challenge the Revised JD through this process.  But, as another court held in a relevant context,

"[t]he possibility that an agency may make an error that is beyond the effective reach of a court

---

[6]  At the hearing, Plaintiffs argued that proceeding without a permit when the Corps has
already determined jurisdiction could put Plaintiffs at risk of steeper penalties and even criminal
liability if the Corps succeeded in an enforcement action, because violating the CWA after
gaining knowledge of CWA jurisdiction could demonstrate Plaintiffs' bad faith.  Whether a
particular agency action may be used as evidence against a party in a subsequent proceeding
does not amount to a change in that party's rights or obligations, nor is it fairly characterized as a
legal consequence.  See Fairbanks, 543 F.3d at 595 ("[T]he possibility that Fairbanks might
someday face a greater risk of increased fines should it proceed without regard to the Corps'
assertion of jurisdiction does not constitute a legal consequence of the approved jurisdictional
determination.") (emphasis original).

is part of the price we pay for the advantages of an administrative process." Thermal Ecology

Must be Preserved v. Atomic Energy Comm'n, 433 F.2d 524, 526 (D.C. Cir. 1970). Although

Plaintiffs might prefer a faster or less expensive way to challenge the Revised JD, the law views

the permitting process as a proper procedural juncture to access judicial review in connection

with the CWA. See, e.g., Fairbanks, 543 F.3d at 594-95.

### 2. Adequacy of Judicial Remedies

In addition to considering the Bennett conditions, Sackett also considered whether the

petitioners were left without "other adequate remedy in a court." Id. at 1372 (quoting 5 U.S.C. §

704). Generally, the party seeking to alter wetlands subject to the CWA may seek judicial

review by one of two methods. First, he may proceed with the planned development or other

alteration without consulting the Corps or the EPA. The EPA may then choose to bring an

enforcement action against him, which would bring the party into court. See 33 U.S.C. § 1319;

33 C.F.R. §§ 326.3, 326.5. The Court in Sackett rejected this option, holding that waiting to be

sued while incurring potentially significant penalties was not a sufficient remedy. See generally

Sackett, 132 S. Ct. at 1372-74.

Second, the party may apply for a permit from the Corps, and if the permit is denied

through the administrative process, he may file suit. See 33 C.F.R. §§ 331.10, 331.12. The

Supreme Court held that this was not an adequate remedy for the petitioners in Sackett, because

the EPA, a separate agency, had already issued a compliance order. Id. at 1372 ("The remedy

for denial of action that might be sought from one agency does not ordinarily provide an

'adequate remedy' for action already taken by another agency.").

Neither of these "dead ends" apply to Plaintiffs. First, unlike the petitioners in Sackett,

Plaintiffs are not at the mercy of the Corps while they continue to accrue liability. On the

contrary, Plaintiffs may choose if future administrative proceedings regarding the Property will

occur and Plaintiffs will not accrue liability in the meantime. Unlike the petitioners, Plaintiffs

have the ability to "initiate [the] process" which will bring them before the Court. See Sackett,

132 S. Ct. at 1372.

Regarding the second remedy, as noted, Plaintiffs have the unhindered option of pursuing

a permit from the Corps. Both Sackett and Fairbanks viewed the permit process as a proper

avenue after which judicial review of agency action under the CWA was appropriate. See

Sackett, 132 S. Ct. at 1372; Fairbanks, 543 F.3d at 594-95; see also Coxco, 2008 WL 640946, at

*5. Sackett found the permit process inadequate only because it would not serve to remedy the

compliance order already issued by the EPA, a separate agency. Sackett, 132 S. Ct. at 1372. In

this case, Plaintiffs face no such dilemma.

Finally, Plaintiffs now have a third avenue to judicial review. If Plaintiffs choose to

begin mining without a permit and the government issues a compliance order, Plaintiffs may, as

a result of Sackett's holding, seek immediate judicial review of the compliance order and resolve

the status of their operations. Because the Revised JD does not satisfy both Bennett conditions,

and because Plaintiffs have "other adequate remedy in a court," the determination is not

reviewable at this time.

**F. Ripeness**

Both parties offer brief arguments regarding why the doctrine of ripeness might also

determine the outcome of this motion. Because the Court holds judicial review is not

appropriate for the reasons stated above, it declines to reach the issue of ripeness.

## IV.  CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.      Defendant's Motion to Dismiss [Docket No. 11] is **GRANTED**; and,

2.      All claims in the Amended Complaint [Docket No. 7] are **DISMISSED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

> BY THE COURT:
>
>
> _____s/Ann D. Montgomery_____
> ANN D. MONTGOMERY
> U.S. DISTRICT JUDGE

Dated:  August 1, 2013.