# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

Hawkes Co., Inc., Pierce Investment
Company, and LPF Properties, LLC,

      Plaintiffs,

v.

UNITED STATES ARMY CORPS OF
ENGINEERS,

      Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

Court File No. 13-CV-107 (ADM/TNL)

**MEMORANDUM IN SUPPORT OF
PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT**

## INTRODUCTION

Plaintiffs Hawkes Co., Inc. ("Hawkes"), Pierce Investment Company ("Pierce Investment"), and LPF Properties, LLC ("LPF") respectfully submit this memorandum in support of their motion for summary judgment.

Plaintiffs are: 1) the owners (Pierce Investment and LPF) of a 520 acre parcel of real property located in rural Minnesota that includes approximately 155 acres of wetlands (the "Wetlands"); and 2) a peat-mining company ("Hawkes") that seeks to conduct peat-mining operations on the Wetlands. Plaintiffs commenced this action seeking review under the Administrative Procedure Act, 5 U.S.C. § 551, *et seq*., of a final agency action of the Army Corps of Engineers asserting jurisdiction under the Clean Water Act to require a permit as a condition of conducting peat-mining operations on the Wetlands.

This Court's review is based on the administrative record compiled by the Corps. Jurisdiction under the Clean Water Act, as interpreted by the United States Supreme Court, requires either a "continuous connection" or a "significant nexus" between the

allegedly jurisdictional wetlands and a navigable body of water. The Corps' asserts jurisdiction here based on the "significant nexus" theory. However, the administrative record underlying the Corps' determination is devoid of site-specific, objective evidence necessary to establish the existence of a significant nexus. In fact, after the Corps' initial determination of jurisdiction was reversed through the Corps' own administrative appeal process for lack of sufficient evidence, the Corps did not undertake any further investigation or provide any new data, as directed by the order on appeal. Rather, the Corps' reissued its jurisdictional determination ("JD") based on the very same administrative record, simply using different words to describe the same evidence and reaching the same (fatally flawed) conclusion.

The Corps' own appeal officer got it right when he rejected the Corps' JD as lacking evidentiary support, and the evidence has not changed since the administrative appeal. Because the evidence in the administrative record is insufficient to support the Corps' exercise of jurisdiction, the Corps' JD must be rejected as arbitrary, capricious and contrary to law.

STATEMENT OF UNDISPUTED MATERIAL FACTS

The following facts, for purposes of this motion, are undisputed.

**A.     Identification of the Parties**

Pierce Investment and LPF are owners of property in Marshall County, Minnesota that contains approximately 155 acres of wetlands (the "Wetlands"). A related company, Hawkes, is in the peat-mining business and seeks to expand its existing peat-mining

operations to the Wetlands. Hawkes will pay Pierce Investment and LPF a royalty in exchange for the right to conduct peat-mining on the Wetlands.

The Army Corps of Engineers ("Corps") is an agency of the United States government with authority to issue permits under the Clean Water Act, 33 U.S.C. § 1251, *et seq*. (the "Act"), for the discharge of dredged and fill materials into "navigable waters," which are defined by the CWA to mean "waters of the United States, including territorial seas." 33 U.S.C. § 1362(7)(definition of navigable waters); 33 U.S.C. § 1344 (the Corps' permitting authority). The Corps determines whether particular property qualifies as "waters of the United States," and is thus subject to its permitting jurisdiction under the CWA, by issuing a document called an "Approved Jurisdictional Determination" or "JD." 33 C.F.R. §§ 320.1(b), 325.9 & 331.2.

### B.     Administrative Proceedings Before the Corps

#### 1.     The Draft JD

On December 13, 2010, Hawkes applied to the Corps for a permit to expand its existing peat-mining operations to the Wetlands. Affidavit of Gregory Merz ("Merz Aff."), Ex. 1. On March 15, 2011, the Corps issued a letter to Hawkes that stated that the Corps had made a "preliminary determination that this wetland is a water of the United States and is regulated by the Corps under Section 404 of the Clean Water Act." Merz Aff., Ex. 2. Plaintiffs asked the Corps to provide information on which it based its assertion of jurisdiction. In response, on November 8, 2011, the Corps provided Plaintiffs with a copy of a draft JD (the "Draft JD") for the Wetlands. Merz Aff., Ex. 4. The Draft JD concluded that there was jurisdiction over the Wetlands under the CWA, based on the

finding that the Wetlands abutted a relatively permanent waterway ("RPW") that flowed directly or indirectly to a traditionally navigable waterway ("TNW"). Specifically, the Draft JD asserted that a visit by a Corps representative had confirmed that water flowed from the Wetlands through two culverts to an unnamed stream that flowed to the Middle River, which flowed to the Red River. The Draft JD did not reflect any analysis of the impact of the Wetlands on the Red River, much less the significance of any such impact.

By correspondence dated December 19, 2011, Plaintiffs, through their wetlands consultant, identified numerous errors in the Draft JD and provided the Corps with additional information to consider. Merz Aff., Ex. 5. Among other things, the consultant provided data showing that that there was, in fact, no relatively permanent waterway connecting the Wetlands to the Red River.

### 2. The Initial JD

On February 7, 2012, the Corps issued an Approved JD (the "Initial JD"). In this Initial JD, the Corps found jurisdiction that was a significant nexus between the Wetlands and the Red River and, accordingly, that the Wetlands are "water[s] of the United States" under the CWA. Merz Aff., Ex. 6. According to the Initial JD, the Wetlands are located adjacent to a manmade surface ditch. The ditch connects to what the Corps identified as an "intermittent" unnamed tributary of the Middle River which flows to the Red River.

### 3. Appeal from, and Reversal of, the Initial JD

On April 4, 2012, Plaintiffs filed a timely appeal of the Initial JD under 33 C.F.R. §331.6 setting forth the reasons why the Wetlands are not waters of the United States. Merz Aff., Ex. 7. In support of their appeal, Plaintiffs focused on the lack of site-specific,

objective data to support the Initial JD. To that end, Plaintiffs pointed out that the Corps had provided "no measurable or quantitative chemical data on how the . . . [W]etlands affects the chemical integrity of the Red River of the North." Further, Plaintiffs noted that the physical connection between the Wetlands and any similarly situated wetland to the Red River is insignificant and, although the Corps had claimed to quantify the water storage capacity of the Wetlands, this quantification had little meaning because it was unrelated to any quantification of flow. Additionally, Plaintiffs explained that nutrient discharge from the Wetlands was minimal and that the Wetlands otherwise lacked any significant biological connection to the Red River.

Following a hearing in which the parties each presented their positions on the jurisdictional issue, an Administrative Appeal Decision ("Appeal Decision") was issued on October 24, 2012, finding that the appeal had merit and that the administrative record "[did] not contain sufficient documentation/analysis to support a finding of Clean Water Act jurisdiction." Merz Aff., Ex. 8. In support of that conclusion, the Appeal Decision noted, among other things:

- "The [Administrative Record] does not contain data supporting flow regime, volume, duration, or frequency from the wetlands to the river. Additionally, the District states that indicators of the transport of energy, materials, and nutrients were observed during a site visit, but there is no quantitative date [sic] given to support the finding." (footnote omitted)

- "While the [Administrative Record] provides information indicating an OHW [*i.e.*, "ordinary high water"] mark for the unnamed tributary exists, it does not provide sufficient evidence to establish a significant nexus that the number of flow events, volume, duration, and frequency of water flowing through the tributary are such that it has an appreciable effect on the TNW [*i.e.*, "traditional navigable water"]." (footnote omitted)

- "The [Administrative Record] included a description of the stream channel riparian corridor from the unnamed tributary to the TNW. However, the water flow regime information was not sufficient to indicate that a significant nexus exists." (footnote omitted)

### 4. The Revised JD

Following remand, on December 31, 2012, over two years after Hawkes' permit application, the Corps issued a revised JD (the "Revised JD") and advised Plaintiffs that the Revised JD is a "final Corps permit decision in accordance with 33 C.F.R. §331.10." Merz Aff., Ex. 9. The Revised JD, although purporting to rely on the existence of a significant nexus to support jurisdiction, does not contain any new data, measurements, or information to support that conclusion. The Revised JD did not add any new information that would demonstrate how the Wetlands, either quantitatively or qualitatively, significantly affect the physical, biological, and chemical integrity of the Red River of the North located 120 river miles from the property. The Revised JD simply revised the language of its conclusions to omit words and phrases that highlighted the speculative nature of its finding of a significant nexus. Even though the Corps had ample time to establish jurisdiction, its Revised JD, like the Initial JD, speaks only to the overall functions provided by wetlands in general and stream headwaters in general and, as the Review Officer found, it does "not speak to how the specific onsite wetland and tributaries have a significant nexus that is more than speculative or insubstantial on the chemical, physical or biological integrity of the downstream [traditionally navigable waters]."

### C.    Court Proceedings

Having exhausted their administrative appeals, Plaintiffs commenced this action seeking judicial review pursuant to the Administrative Procedure Act ("APA"). Plaintiffs commenced their action on January 11, 2013, and filed an Amended Complaint on March 13, 2013. In lieu of filing an Answer, the Corps moved to dismiss on the grounds that a JD is not a final agency action that is appealable under the APA. This Court granted the Corps' motion and the Plaintiffs appealed to the Eighth Circuit. The Eighth Circuit reversed the dismissal and remanded the case. *Hawkes Co. v. United States Army Corps of Engineers*, 782 F.3d 994 (8th Cir. 2015). The Eighth Circuit denied Corps' petition for rehearing and rehearing *en banc* and issued its mandate on July 17, 2015.

## ARGUMENT

## I.    Standard of Review

### A.    The Summary Judgment Standard

Summary judgment is appropriate where the moving party shows that there are no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1886); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. *Ludwig v. Anderson*, 54 F.3d 464, 470 (8th Cir. 1995). In opposing a motion for summary judgment, the nonmoving party may not rest on mere allegations or denials, but

must demonstrate on the record the existence of specific facts which create a genuine issue for trial. *Krenik v. Count of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).

**B.    Standard for Review of Agency Actions**

Review of an agency action under the Administrative Procedure Act is generally limited to a review of the agency's administrative record. *Newton County Wildlife Ass'n v. Rogers*, 141 F.3d 803, 807 (8th Cir. 1998). An agency action may be set aside if it is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law." 5 U.S.C. §706(2)(A). An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Board of Regents of the University of Minnesota v. Shalala*, 837 F. Supp. 303, 309 (D. Minn. 1993) (citations omitted); *see also Jet Investment, Inc., v. Department of the Army*, 84 F.3d, 1137, 1140-41 (9th Cir. 1996) (agency decision held arbitrary and capricious where the evidence in the administrative record was insufficient to support the agency's conclusions). An agency action must also be set aside if it is "in excess of statutory jurisdiction, authority or limitations, or short of a statutory right." 5 U.S.C. §706(2)(C).

There is no dispute in this case regarding the contents of the administrative record compiled by the Corps. The issue is whether the evidence contained in that record supports CWA jurisdiction.  Because this appeal from the decision of an administrative agency is based on the administrative record, the issue is ripe for summary judgment.

**II.     The Wetlands Do Not Meet Either Legal Test for the Assertion of Federal Jurisdiction under the CWA**

   **A.     Overview: The "Continuous Connection" and "Significant Nexus" Tests for Establishing Jurisdiction under the CWA**

Congress enacted the Clean Water Act in 1972 "to restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. § 1251; *United States v. Bailey*, 591 F.3d 791, 797 (8th Cir. 2009). The CWA prohibits discharge of dredged and fill material into "navigable waters" without a permit and authorizes the Secretary of the Army, acting through the Corps, to issue such permits. 33 U.S.C. §§ 1311(a), 1344. The CWA defines "navigable waters" to mean "waters of the United States, including territorial seas." 33 U.S.C. § 1362(7).

The scope of the Corps' jurisdiction under the CWA has been addressed on a number of occasions by the United States Supreme Court.[1] Before the passage of the CWA, the Court had interpreted "navigable waters of the United States" as used in predecessor statutes to be limited to interstate waters that are "navigable in fact" or readily susceptible of being rendered so. *See Rapanos v. United States*, 547 U.S. 715, 723 (2006), *citing The Daniel Ball*, 10 Wall. 557, 563 (1871); *United States v. Appalachian Elec. Power Co.*, 311 U.S. 377, 406 (1940). In *United States v. Riverside Bayview*

---

[1] Since the Eighth Circuit's decision in this case, the Department of Defense and Environmental Protection Agency promulgated a new administrative rule regarding the scope of the CWA, *see* 80 Fed. Reg. 37,054, 37,054 (June 29, 2015). That rule is the subject of litigation pending in this and other federal courts. *See, e.g., Washington Cattlemen's Ass'n v. U.S. Envtl. Prot. Agency*, No. 0:15-cv-03058 (D. Minn., filed July 15, 2015). However, because Plaintiffs' claims in this case are based on the language of the CWA as interpreted by the Supreme Court, and not on the rule, the pending litigation regarding the rule's validity is not material to the motion before the Court.

*Homes, Inc.*, 474 U.S. 121 (1985), however, the Court found that Congress intended federal jurisdiction under the CWA to extend to "at least some waters that could not be deemed 'navigable' under the classical understanding of that term." 474 U.S. at 133. Thus, the Court found that "waters of the United States" subject to the Corps' permitting jurisdiction extended to wetlands that directly abutted a navigable waterway. 474 U.S. at 135.

The Court next addressed jurisdictional waters under the CWA in *Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers*, 531 U.S. 159 (2001) ("*SWANCC*"). There, the Court rejected the exercise of jurisdiction by the Corps over isolated ponds within a single state based upon use of the ponds as a habitat by migratory birds that cross state lines. 531 U.S. at 171-72. The Court held that the CWA's language could not support an expansive interpretation of federal jurisdiction extending to ponds that are not adjacent to open water. 531 U.S. at 168. The Court refused to enforce an interpretation of the CWA that would read the word "navigable" out of the statute altogether. 531 U.S. at 172.

The Supreme Court most recently considered the Corps' jurisdiction under the CWA in *Rapanos v. United States*, 547 U.S. 715 (2006). There the Court considered whether four Michigan wetlands, located near ditches or manmade drains that eventually emptied into traditional navigable waters, constituted "waters of the United States" within the meaning of the CWA. 547 U.S. at 729. A five-Justice majority found that the decision of the Court of Appeals affirming the Corps' exercise of jurisdiction should be vacated, but reached that conclusion based on two different legal tests. Justice Scalia, writing for a

four-Justice plurality, applied a test that would extend federal jurisdiction under the CWA to "only those wetlands with a continuous surface connection to bodies that are waters of the United States in their own right, so that there is no clean demarcation between 'waters' and wetlands, are 'adjacent to' such waters and covered by the Act." 547 U.S. at 742. Justice Kennedy, concurring in the result, applied a different test. Justice Kennedy found that wetlands may be subject to federal jurisdiction only if they have a "significant nexus" to navigable waters. 547 U.S. at 779. The Eighth Circuit has held that wetlands are subject to federal jurisdiction if they meet either Justice Scalia's "continuous connection" test or Justice Kennedy's "significant nexus" test. *United States v. Bailey*, 571 F.3d 791, 799 (8th Cir. 2009).

### B.    The Wetlands Are Not Adjacent To Jurisdictional Waters

In *Riverside Bayview*, the Court held for the first time that the Corps' permitting jurisdiction under the CWA extended beyond waters that had traditionally been considered to be navigable. *See* 474 U.S. at 133. In reaching that conclusion the Court noted that determining the point at which water ends and land begins "is often no easy task." *Id.* In light of the difficulty of drawing a clear distinction, the *Riverside Bayview* Court found that federal jurisdiction appropriately included wetlands that directly abutted "waters of the United States."

In *Rapanos*, Justice Scalia noted that the difficulty of delineating the boundary between water and land was central to the reasoning of *Riverside Bayview*. 547 U.S. at 740. Justice Scalia further found that water bodies that are "isolated" do not present a

similar boundary-drawing problem and, therefore, jurisdiction cannot be exercised on that basis. Accordingly, Justice Scalia stated the applicable test as follows:

> [O]nly those wetlands with a continuous surface connection to bodies that are "waters of the United States" in their own right, so that there is no clear demarcation between "water" and wetlands, are "adjacent to" such waters and covered by the Act. Wetlands with only an intermittent, physically remote hydrologic to "waters of the United States" do not implicate the boundary drawing problem of *Riverside Bayview*, and thus lack the necessary connection that we described as a "significant nexus" in *SWANCC*.

547 U.S. at 742.

Although the JD asserts that that the Wetlands is connected to a traditionally navigable waterway – the Red River – via a manmade ditch that carries flow from the Wetlands to an unnamed tributary of the Middle River and from there to the Red River, it also acknowledged, that only standing water, and no flow, has been observed in the ditch. Merz Aff., Ex. 9 (Approved Jurisdictional Determination Form at p. 3.) In fact, photographic evidence shows water does not flow through the ditch even during wet periods. Merz Aff. Ex. 7 (Reasons for Appeal at p. 6.) The ditch, which was constructed to improve farming by providing a conduit for water pooling upstream from the ditch, not as an outlet for the Wetlands, is over 1,500 feet from the Wetlands and is separated from the Middle River by over 1,300 feet of upland. Merz Aff., Ex. 7 (Reasons for Appeal at pp. 2, 6.) A drainage divide separates the Wetlands from the ditch, directing the flow of water away from, rather than toward, the ditch. Merz Aff., Ex. 7 (Reasons for Appeal at pp. 5, 8.) There is no evidence, as distinguished from speculation, that would support a conclusion that there is a regularly-occurring flow of water from the Wetlands to

jurisdictional waters such that the Wetlands can be considered to be adjacent to navigable waters, as required by Justice Scalia's test. Rather, the Wetlands are properly considered isolated from any jurisdictional waters.

C.     **The Wetlands Do Not Meet Justice Kennedy's "Significant Nexus" Test**

Justice Kennedy, like Justice Scalia, focused on the requirement set out in *SWANCC* of a significant nexus between wetlands and "navigable water," but, unlike Justice Scalia, did not interpret the phrase "significant nexus" to mean a continuous surface connection. According to Justice Kennedy, such a requirement "makes little practical sense in a statute concerned with downstream water quality." 547 U.S. at 769. Justice Kennedy further observed:

> The merest trickle, if continuous, would count as a "water" subject to federal regulation, while torrents thundering at irregular intervals through otherwise dry channels would not. The plurality seems to assume that such irregular flows are too insignificant to be of concern in a statute focused on "waters," that may not always be true.

*Id.*

Instead, Justice Kennedy reasoned that the existence of a significant nexus must be determined in light of the CWA's goals: restoring and maintaining the chemical, physical, and biological integrity of the Nation's waters. 547 U.S. at 779, citing 33 U.S.C. § 1251(a). Thus, Justice Kennedy concluded that the existence of a significant nexus between a wetland and navigable waters must be based on the effect the wetlands has on water quality of a navigable water. Justice Kennedy articulated the legal standard as follows:

Accordingly, wetlands possess the requisite nexus, and thus come within the statutory phrase "navigable waters," if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as "navigable." When, in contrast, wetlands' effects on water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the statutory term "navigable waters."

547 U.S. at 780. Justice Kennedy further stated that, "[T]he Corps must establish a significant nexus on a case-by-case basis when it seeks to regulate wetlands based on adjacency to non-navigable tributaries." 547 U.S. at 782. Such a showing requires more than a "mere hydrologic connection," but rather must establish "some measure of the significant of the connection for downstream water quality." 547 U.S. at 784.

In *Precon Dev. Corp. v. United States Army Corps of Engineers*, 633 F.3d 278 (4th Cir. 2011), the court addressed the nature of the evidence necessary to satisfy Justice Kennedy's significant nexus test. That case concerned the assertion of federal jurisdiction over wetlands adjacent to a 2,500 foot manmade ditch with seasonal flows that joined another, longer perennial drainage ditch that traveled approximately 3,000 feet before connecting to a second perennial tributary that flowed to a navigable water—the Northwest River—approximately three to four miles downstream. 633 F.3d at 282. The court held that the administrative record was insufficient to support the exercise of jurisdiction over the wetlands at issue. First, the court found that the record did not contain any measurement of actual flow. 633 F.3d at 294. Further, the court noted that evidence of the flow of an adjacent tributary, standing alone, would not establish a significant nexus, stating that "there is not documentation in the record that would allow us to review [the Corps'] assertion that the functions that these wetlands perform are

'significant' for the Northwest River." 633 F.3d at 295. According to the court, the lack of evidence showing a substantial impact of the wetlands on a navigable water was especially significant in light of the distance between the wetland and the Northwest River, nearest navigable water:

> Accordingly, we must conclude that this record does not support the Corps' determination that the nexus that exists between the 448 acres of similarly situated wetlands and the Northwest River is "significant." Particularly given the facts of this case, involving wetlands adjacent to two manmade ditches, flowing at various and unknown rates toward a river five to ten miles away, we cannot accept, without information on the river's condition, the Corps' conclusion that the nexus here is significant. Justice Kennedy created the significant nexus test specifically because he was disturbed by the assertion of jurisdiction over wetlands situated along a ditch "many miles from any 'navigable-in-fact water,' carrying 'only insubstantial flow toward it.'"

633 F.3d at 295, citing *Rapanos*, 547 U.S. at 786 (Kennedy, J, concurring in judgment).

The Corps' assertion of jurisdiction is based on its conclusion that there is a significant nexus between the Wetlands the Red River. Even assuming that the evidence were sufficient to establish a regular flow from the Wetlands toward the Red River, the evidence not establish any degree of impact of the Wetlands on the water quality of the Red River, as required to show a significant nexus.

The Wetlands at issue here are even further from the nearest navigable water—the Red River of the North—than was the case in *Precon* and the evidence of flow from the Wetland affecting navigable water is no more substantial. Here, the Corps' JD states that the Wetlands are thirty or more miles from a traditional navigable water. Merz Aff., Ex. 9 (Jurisdictional Determination Form at p. 2.) In fact, the Wetlands are over 50 aerial miles

and over 120 river miles from the nearest traditional navigable water. Merz Aff. Ex. 8 (Reasons for Appeal at p. 2.)

Further, the undisputed facts contained in the Administrative Record do not support a conclusion of any significant flow from the Wetlands to the Red River. The Initial JD noted that the relevant tributary had only been observed once, in December 2011, and that no surface flows were observed at that time. Merz Aff., Ex. 6 (Section IIIC Significant Nexus Determination at p. 2.) The Initial JD went on to state that, based upon the District's "seasonal stream evaluation protocol" it was "reasonable to conclude that the tributary has seasonal flows between ice out and mid-June." The Initial JD also admitted, however, that "additional site investigation would be required to confirm this contribution." Merz Aff., Ex. 6 (Approved Jurisdictional Determination Form at p. 3.)

The Corps' analysis in support of its jurisdictional determination does not reflect the kind of case-by-case, evidence-based evaluation necessary to satisfy Justice Kennedy's significant nexus test. *Cf. Rapanos*, 547 U.S. at 782. The exercise of jurisdiction cannot be based on such speculation, a point acknowledged by the Corps in granting Plaintiffs' appeal from the Initial JD. The Appeal Decision stated:

> The AR does not contain data supporting flow regions, volume, duration, or frequency of flow from the wetlands to the river. Additionally, the District states that indicators of the transport of energy, materials, and nutrients were observed during a state visit, but there is not quantitative data to support the finding.

Merz Aff. Ex. 8 (Administrative Appeal Decision at p. 8.) Further, the Appeal Decision observed:

While the AR provides information indicating an OHW mark for the unnamed tributary exists, it does not provide sufficient evidence to establish a significant nexus that the number of flow event, volume, duration, and frequency of water flowing through the tributary are such that it has an appreciable effect on the TNW. The District stated that flow was present during the site visit; however, the District could not definitively identify any type of the flow present in the channel by either precipitation runoff or by groundwater flow. Additionally, the District stated that additional site investigations would be needed to determine the site's hydrologic connectivity.

Merz Aff. Ex. 8 (Administrative Appeal Decision at p. 11.)

Thus, the Appeal Decision provided the Corps with a roadmap of the evidence necessary to support the exercise of jurisdiction. Unfortunately, the Corps essentially ignored that roadmap. The Corps had an opportunity to perform further investigation following remand but declined to do so. As a result, the Administrative Record contains no new data, measurements, or evidence gathered following the remand. Specific deficiencies identified through the Corps' own administrative review process and that the Revised JD makes no effort to remedy include:

- Failure to provide data supporting flow regions, volume, duration, or frequency of flow from the Wetlands to the Red River;

- Failure to provide quantitative data regarding the transport of energy, materials, and nutrients from the Wetlands to the Red River;

- Failure to provide evidence that the number of flow event, volume, duration, and frequency of water flowing through the tributary are such that it has an appreciable effect on the Red River;

- Failure to confirm hydrological connectivity through site investigations.

In short, the Revised JD provides none of the specific data that the Appeal Decision found was required. Indeed, the Revised JD is based on the very same evidence that the Appeal Decision found to be inadequate.

Generalizations are not an adequate substitute for site-specific data. In granting Plaintiffs' appeal from the Initial JD, the Corps' Appeal Decision found that:

> The District speaks to the overall functions provided by the stream headwaters, the similarly situated wetlands, and wetlands in general, within the review area. However, they do not speak to how the functions that the specific onsite wetland and tributaries have a significant nexus that is more than speculative or insubstantial on the chemical, physical, or biological integrity of the downstream [Traditionally Navigable Water].

Merz Aff. Ex. 8 (Administrative Appeal Decision at p. 13.) As the court noted in *Precon*; "The significant nexus inquiry emphasized the comparative relationship between the wetlands at issue, their adjacent tributary, and traditional navigable waters." 633 F.3d at 294, citing *Rapanos*, 547 U.S. at 780 (Kennedy, J., concurring in judgment). Evidence necessary to evaluate the relationship of this specific Wetlands to a specific navigable water is wholly lacking here.

Although, after the Appeal Decision, the evidence did not change; the language the Corps to characterize that evidence did. For example, the Appeal Decision was critical of the JD's use of words "suggest" and "reasonable to conclude" as implying speculation, noting that "there were no specific facts documented that could verify these assertions." Merz Aff. Ex. 8 (Administrative Appeal Decision at p. 8.) The Corps, rather than providing the specific facts that were found to be lacking, simply used different words to avoid highlighting the speculative nature of the JD's conclusions. Thus, where

the Initial JD stated "Given this information <u>it is reasonable to conclude</u> that the tributary has season flow . . . ," the Revised JD re-crafted the sentence to read, Given this information <u>the District has characterized</u> the flow in the tributary as seasonal . . . ." Compare Merz Aff., Ex. 6 (Jurisdictional Determination Form at p. 3) with Merz Aff. Ex. 9 (Jurisdictional Determination Form at p. 4.) (emphasis added). The Revised JD also omitted the sentence found in the Initial JD at the end of that same paragraph that stated, "However, additional site investigation would be required to confirm this contribution." Rather than actually perform the additional investigation that the Corps' own analysis determined was required, the Corps simply left out the sentence that undermined its conclusion. Compare Merz Aff., Ex. 6 (Jurisdictional Determination Form at p. 3) with Merz Aff. Ex. 9 (Jurisdictional Determination Form at p. 4.) Later, the Initial JD observes, in language that is characteristic of speculation, "<u>Although not verified</u>, surface flows <u>are believed to occur</u> in response to snowmelt and precipitation and <u>would most likely be present</u> between March and June and after significant precipitation events in other portions of the growing season." The Revised JD revised the sentence to read: "Surface flows <u>occur</u> in response to snowmelt and precipitation with continuous discharges <u>present</u> between March and June and more intermittent discharges occurring after significant precipitation events in other portions of the year. Compare Merz Aff., Ex. 6 (Jurisdictional Determination Form at p. 5) with Merz Aff. Ex. 9 (Jurisdictional Determination Form at p. 6.) (emphasis added). Again, although paying lip service to the concerns identified by the Appeal Decision, the Corps fails to confront the real problem: the lack of specific evidence to support its determination.

There are numerous other examples of the Corps' linguistic efforts to hide the ball. Thus, where the Initial JD stated that "wetlands in the relevant reach <u>are believed</u> to function at a high level for all functions considered," the Revised JD asserts that "wetlands in the relevant reach <u>have been assessed</u> to function at a high level for all functions considered." Compare Merz Aff., Ex. 6 (Section IIIC Significant Nexus Determination at p. 1) with Merz Aff., Ex. 9 (Section IIIC Significant Nexus Determination at p. 1) (emphasis added). Just by changing a few words, the Corps manages to transform a speculative "belief" into a much more scientific and reliable-sounding "assessment."

In describing the functions provided by the unnamed tributary that is the only connection of the manmade ditch to the Middle River, the Initial JD. stated, "The Corps has not quantitatively assessed the flow regime of the tributary but, based on the size of the drainage area, observed flow through wetlands in June, and direct observations of <u>what are believed to be</u> groundwater supported pools in the stream channel, has <u>preliminarily established</u> that the stream has an intermittent flow regime." The Revised JD, in contrast, stated, "The Corps has not quantitatively assessed the flow regime of the tributary but, based on the size of the drainage area, observed flow in the wetlands in June, and direct observations of <u>groundwater pools</u> in the stream channel, has made a <u>determination</u> that the stream has intermittent flow regime . . . ." Compare Merz Aff., Ex. 6 (Section IIIC Significant Nexus Determination at fn. 3) with Merz Aff., Ex. 9 (Section IIIC Significant Nexus Determination at fn. 3.) (emphasis added).

The Initial JD acknowledged that "Flow in the unnamed tributary has not been quantitatively assessed and the only direct observations of the channel were made in December of 2011 at which time there was standing water in pools but no continuous flow." The Revised JD omits this inconvenient sentence altogether in favor of the unsupported assertion that "The District has characterized the flow in the tributary as intermittent with continuous flow occurring from mid-March through June in normal years." Compare Merz Aff., Ex. 6 (Section IIIC Significant Nexus Determination at p. 2) with Merz Aff., Ex. 9 (Section IIIC Significant Nexus Determination at p. 2). Whatever this characterization may be based on, it was clearly not based on observation or reliable evidence.

The language changes reflected in the Revised JD are admittedly subtle and can only be ferretted out by painstaking comparison of the Revised JD with the Initial JD. They were made for the purpose of making it appear as if there were specific, objective evidence of a significant nexus between the Wetlands and the Red River, and not just speculation and generalizations. The Corps' tactics, however, cannot obscure the fact that the Administrative Record does not satisfy the legal requirements established by the Supreme Court as a precondition to the assertion of CWA jurisdiction over the Wetlands.

The Eighth Circuit, in finding the Corps' JD subject to judicial review, characterized the Corps' assertion of jurisdiction, with evident disfavor, as "expansive." 782 F.3d at 1001-02. Notwithstanding the Supreme Court's guidance regarding the

appropriate scope of jurisdiction under the CWA, the Corps' over-reaching continues unabated. As the Eighth Circuit observed:

> The prohibitive costs, risk, and delay of . . . alternatives to immediate judicial review evidence a transparently obvious litigation strategy: by leaving appellants with no immediate judicial review and no adequate alternative remedy, the Corps will achieve the result its local officers desire, abandonment of the peat mining project, without having to test whether its expansive assertion of jurisdiction – rejected by one of their own commanding officers on administrative appeal – is consistent with the Supreme Court's limiting decision in *Rapanos*. For decades the Corps has "deliberately left vague" the "definitions used to make jurisdictional determinations," leaving its District offices free to treat as waters of the United States "adjacent wetlands" that "are connected to the navigable water by flooding, on average, once every 100 years," or simply "within 200 feet of a tributary." *Rapanos*, 547 U.S. at 727-28, quoting a GAO report.

*Hawkes*, 782. F.3d at 1001-02. Under the controlling precedent of *Rapanos*, the Corps' assertion of jurisdiction must be rejected as arbitrary, capricious and contrary to law.

## CONCLUSION

For the foregoing reasons, Plaintiffs ask the Court to reverse the Corps' JD as arbitrary and capricious and contrary to law and to enjoin the Corps from asserting jurisdiction over the Wetlands.

DATED: August 12, 2015.

Respectfully submitted,

GRAY, PLANT, MOOTY,
 MOOTY & BENNETT, P.A.


By s/Gregory Merz
   Gregory R. Merz (#185942)
   Nancy Quattlebaum Burke (#161044)
   500 IDS Center
   80 South Eighth Street
   Minneapolis, MN 55402
   Telephone: (612) 632-3257 / 3029
   Facsimile: (612) 632-4257 / 4029
   Gregory.merz@gpmlaw.com
   Nancy.burke@gpmlaw.com


ATTORNEYS FOR PLAINTIFFS

GP:3323779 v2