## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Hawkes Co., Inc., Pierce Investment Co.,
and LPF Properties, LLC,

                    Plaintiffs,

    v.

United States Army Corps of Engineers,

                    Defendant.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 13-107 ADM/TNL

_____

Gregory R. Merz, Esq., and Nancy Quattlebaum Burke, Esq., Gray Plant Mooty Mooty &
Bennett, PA, Minneapolis, MN, on behalf of Plaintiffs.

Daniel R. Dertke, Esq., United States Department of Justice, Washington, D.C., Friedrich A.P.
Siekert, Esq., United States Attorney's Office, Minneapolis, MN, and Molly McKegney Hunt,
Esq., United States Army Corps of Engineers, St. Paul, MN, on behalf of Defendant.

_____

## I.  INTRODUCTION

On October 28, 2016, the undersigned United States District Judge heard oral argument
on Plaintiffs Hawkes Co., Inc. ("Hawkes"), Pierce Investment Co. ("Pierce Investment"), and
LPF Properties, LLC's ("LPF") Motion for Summary Judgment [Docket No. 49] and Defendant
United States Army Corps of Engineers' (the "Corps") Cross Motion for Summary Judgment
[Docket No. 79].  For the reasons set forth below, Plaintiffs' Motion is granted and the Corps'
Cross Motion is denied.

## II.  BACKGROUND

This case arises from a determination made by the Corps that it has jurisdiction, under the
Clean Water Act, 33 U.S.C. § 1251 et seq. ("CWA"), over 150 acres of wetlands located more
than 90 river miles and 40 aerial miles from the nearest navigable water, the Red River of the
North ("Red River").  Plaintiffs seek judicial review pursuant to the Administrative Procedures

Act, 5 U.S.C. § 702 et seq. ("APA"), of this jurisdictional determination.  Plaintiffs argue that the determination must be reversed as arbitrary, capricious, and contrary to law because the administrative record lacks sufficient evidence to support the exercise of CWA jurisdiction over the specific wetlands at issue.

**A.  Proposed Expansion of Peat Mining Operations**

Plaintiff Hawkes is a peat mining company that plans to mine peat from 150 acres of wetlands (the "Wetlands") located on a 530-acre parcel of land owned by affiliated corporations Pierce Investment and LPF, also Plaintiffs.  Administrative Record ("AR") [Docket No. 65] 87.[1] The Wetlands are located in Marshall County, Minnesota and contain high quality peat that Hawkes seeks to mine for use in the construction of golf greens.  Id.  Hawkes is already mining peat from nearby land.  Expanding operations to include the 150 additional acres would extend the life of Hawkes' mining operations for approximately 16 more years.  AR 88.

**B.  Clean Water Act and Significant Nexus Test for Jurisdiction**

Hawkes' expanded peat mining project would involve the filling or discharge of materials onto the Wetlands.  The CWA prohibits the discharge of materials into "navigable waters," which are broadly defined as "waters of the United States."  33 U.S.C. §§ 1251(a), 1311(a), 1362(6).  The Corps has authority under the CWA to issue permits for the discharge of dredged or fill materials into navigable waters, including wetlands.  See 33 U.S.C. § 1344.  The Corps determines whether particular property qualifies as "waters of the United States" (and is thus subject to its permitting jurisdiction under the CWA) by issuing a document called an

---

[1] Hawkes, Pierce Investment, and LPF are all closely held corporations owned by members of the Pierce family.  Kevin Pierce is an officer in each of the companies.  Am. Compl. [Docket No. 7] ¶ 9.

"Approved Jurisdictional Determination" or "JD."  33 C.F.R. §§ 320.1(b), 325.9, 331.2.

To determine whether the wetlands at issue are "waters of the United States" under the CWA, the Corps has applied the "significant nexus" test established by Justice Kennedy in his concurring opinion in Rapanos v. United States, 547 U.S. 715, 778–82 (2006) (Kennedy, J., concurring).[2]  Under this standard, the Corps has jurisdiction over the wetlands in question if a "significant nexus" exists between the wetlands and navigable waters in the traditional sense.  Id. at 779.  "The required nexus must be assessed in terms of the [CWA's] goals and purposes," which are "to 'restore and maintain the chemical, physical, and biological integrity of the Nation's waters.'"  Id. (quoting § 33 U.S.C. § 1251(a)).  The rationale for regulating wetlands under the CWA is that "wetlands can perform critical functions related to the integrity of other waters—functions such as pollutant trapping, flood control, and runoff storage."  Id. at 779–80 (citing 33 C.F.R. § 320.4(b)(2)).  Accordingly, wetlands satisfy the significant nexus test if:

> the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as "navigable."  When, in contrast, wetlands' effects on water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the statutory term "navigable waters."

Id. at 780.  The test is met if the wetlands in question significantly affect any one of the three

---

[2] The four-justice plurality opinion in Rapanos was authored by Justice Scalia, who articulated an alternative test for establishing CWA jurisdiction over wetlands.  Rapanos, 547 U.S. at 742.  The plurality opinion limits jurisdiction to "those wetlands with a continuous surface connection to bodies that are 'waters of the United States' in their own right, so that there is no clear demarcation between 'waters' and wetlands."  Id.  The Eighth Circuit has held that wetlands are subject to CWA jurisdiction if they satisfy either of the two tests articulated in Rapanos.  United States v. Bailey, 571 F.3d 791, 799 (8th Cir. 2009).  The Corps does not assert jurisdiction under Justice Scalia's "continuous surface connection" test, so it is not analyzed here.

attributes—physical, biological, or chemical.

Conversely, a wetland will not satisfy the significant nexus test if its effect on water quality is speculative or insubstantial.  Bailey, 571 F.3d at 798 (citing Rapanos, 547 U.S. at 780). "Justice Kennedy created the significant nexus test specifically because he was disturbed by the assertion of jurisdiction over wetlands situated along a ditch 'many miles from any navigable-in-fact water,' carrying 'only insubstantial flow toward it.'"  Precon Dev. Corp., Inc. v. U.S. Army Corps of Eng'rs, 633 F.3d 278, 295 (4th Cir. 2011) (quoting Rapanos, 547 U.S. at 786 (Kennedy, J., concurring)).

When, as here, the Corps seeks to regulate wetlands based on adjacency to a non-navigable tributary, it must establish a significant nexus on a case-by-case basis.  Rapanos, 547 U.S. at 782 .  "Given the potential overbreadth of the Corps' regulations, this showing is necessary to avoid unreasonable applications of the statute."  Id.  Although the significant nexus test "does not require laboratory tests or any particular quantitative measurements in order to establish significance," the Corps must present "some evidence of both a nexus and its significance."  Precon, 633 F.3d at 294.  "Otherwise, it would be impossible to engage meaningfully in an examination of whether a wetland ha[s] 'significant' effects or merely 'speculative' or 'insubstantial' effects on navigable waters."  Id.  Moreover, the use of conditional language to assess the significance of the tributaries to which the wetlands are connected "could suggest an undue degree of speculation, and a reviewing court must identify substantial evidence supporting the Corps' claims" of jurisdiction.  Rapanos, 547 U.S. at 786.

**C.  Initial Jurisdictional Determination**

In December 2010, Hawkes applied to the Corps for a permit to begin mining peat from the Wetlands.  AR 80.  On February 7, 2012, the Corps' St. Paul District ("District") issued an Approved Jurisdictional Determination (the "Initial JD") in which it concluded that the Corps has jurisdiction over the Wetlands based upon a significant nexus between the Wetlands and the Red River, the nearest traditional navigable water.  See generally AR 421–42.  The Red River is located at least 93 river miles and 42 aerial miles from the Wetlands.  See AR 120.[3]

The Initial JD determined that the Wetlands are part of a contiguous 591-acre wetland complex (the "Wetland Complex") that flows through a man-made ditch, then into an unnamed seasonal tributary, then to the Middle River, and ultimately to the Red River.  AR 427, 430. More specifically, water from the 151-acre Wetlands flows south under a county road via two 24" culverts, and onto neighboring wetlands located on the other side of the road.  AR 430, 439. The water then continues to flow south through the neighboring wetlands until it reaches a 448-linear foot wetland drainage feature that directs the water east.  AR 430, 440.  The drainage feature connects with a 512-linear foot man-made ditch that cuts through an upland pasture or hayfield of a neighboring farm.  Id.  The 512-foot upland ditch does not have a continuous ordinary high water mark.[4]  AR 430.  Water travels through the upland ditch and is discharged into an unnamed seasonal tributary.  Id.  The seasonal tributary then flows approximately 1,500

---

[3] Plaintiffs contend the Red River is over 120 river miles and over 50 aerial miles and from the Wetlands.  AR 473, 478.  For purposes of this decision, the more conservative mileage figure from the Administrative Record will be used.

[4] Notes from a December 2011 site visit by Corps employees states that "[a]n approximately 12" wide band of the vegetation in the ditch bottom is flattened; however, the ditch appears to be used by wildlife as a travel corridor so it is unclear if the flattened vegetation is primarily a result of water flow or wildlife use."  AR 250.

feet southeast before merging with another stream and entering the Middle River, which flows into the Red River.  AR 427, 430, 436.

The Initial JD acknowledged that water flow in the seasonal tributary connecting Wetlands to the Red River had not been observed during the Corps' field investigations.  See AR 436 ("Flow in the unnamed tributary has not been quantitatively assessed and the only direct observations of the [tributary] were made in December of 2011 at which time there was standing water in pools but no continuous flow."); AR at 428 ("Surface flows were not observed in the tributary by the Corps staff.").  Nevertheless, the Initial JD stated that "[a]lthough not verified, surface flows [in the tributary] are believed to occur in response to snowmelt and precipitation and would most likely be present between March and June and after significant precipitation events in other portions of the growing season."  AR 429.

To evaluate this potential flow, the Corps utilized its seasonal stream evaluation protocol, which uses drainage area measurements to predict whether a tributary will have seasonal flow (i.e., continuous flow for at least three months).  AR 427.  The tributary's drainage area was more than double the threshold size that typically satisfies the Corps' definition of seasonal flow. Id.  Thus, the Initial JD found it "reasonable to conclude" that the tributary has seasonal flow. Id.; see also AR 436 n.3 ("The Corps has not quantitatively assessed the flow regime of the tributary but, based on the size of the drainage area, observed flow through the wetlands in June [2011], and direct observations of what are believed to be groundwater supported pools in the stream channel, has preliminarily established that the stream has an intermittent flow regime.").

The Initial JD also speculated that groundwater may contribute to the tributary's flow based on the existence of the pools in the midst of a severe drought, but stated that "additional

site investigations would be required to confirm this contribution," AR 427, and that the groundwater contribution "ha[d] not been confirmed."  AR 428.  Additionally, the water quality of the tributary was not formally assessed but was "expected to be good based on adjacent land uses, amount of wetlands in the area, and buffers around the tributary."  Id.

The Initial JD also discussed functions that are generally performed by wetlands, such as reducing downstream flooding by providing floodwater storage, and reducing downstream pollution by retaining excess nutrients and sediments.  AR 438.  The general functions of streams and tributaries were also discussed, including their role in transporting nutrients and chemicals to downstream waters.  Id.

The Initial JD also described characteristics of the Red River, including its history of frequent flooding, and its listed status with the Minnesota Pollution Control Agency as impaired for aquatic life and aquatic consumption due to turbidity, as well as mercury and PCB in fish tissue.  AR 437.  The Initial JD concluded that "[t]he functions of the wetlands . . . combined with the functions provided by the tributary results in a significant nexus to the Red River."  AR 434.

**D.  Administrative Appeal**

On April 4, 2012, Plaintiffs administratively appealed the Initial JD to the designated Corps Review Officer.  AR 471–518.  Plaintiffs argued, among other things, that the Corps had not provided site-specific data showing that the Wetlands have more than a speculative or insubstantial effect on the chemical, physical, or biological integrity of the Red River.

Regarding the chemical connection, Plaintiffs argued that the Initial JD provided no measurable or quantitative data on how the Wetlands would affect the chemical integrity of the

Red River.  AR 654.  Rather, the Initial JD talked only in generalities about the functions of headwater streams and wetlands and their importance for nutrient transformation.  Id.

As to the physical connection, Plaintiffs contended that any connection was insignificant because there was little to no flow from the Wetlands to the Red River.  AR 656.  Additionally, Plaintiffs argued that the Wetlands' considerable distance from the Red River caused any connection between them to be speculative and insubstantial at best.  AR 478.

With respect to the biological connection, Plaintiffs argued that the Wetlands provide no fish habitat to support such a connection, the flow in the tributary is too minimal to constitute a significant biological contribution to the Red River, and the Wetlands are ecologically different from the Middle River biome because they are a rich fen, whereas the Middle River is a bottomland forest.  AR 659.

**E.  Appeal Decision**

On October 24, 2012, the Corps issued an Administrative Appeal Decision ("Appeal Decision"), concluding that the Administrative Record lacked sufficient documentation to support a finding that the Wetlands have a significant nexus that is more than insubstantial or speculative on the chemical, physical, and biological integrity of the Red River.  AR 648, 660. The Appeal Decision stated that the Initial JD spoke only to the overall functions provided by stream headwaters and wetlands in general, and did "not speak to how the functions that the specific onsite wetland and tributaries have a significant nexus that is more than speculative or insubstantial on the chemical, physical, or biological integrity of the downstream [traditional navigable water]."  AR 660.  For each of these attributes—chemical, physical, and biological—the Appeal Decision identified the reasons that the Administrative Record was

deficient and the actions needed to complete the record.

### 1.  Chemical Connection

#### a.  Deficiencies

The Appeal Decision noted that the Initial JD's description of the tributary's chemical properties includes statements that "[s]urface flows were not observed in the tributary by the Corps staff," that "[w]ater quality has not been formally assessed," and that "there is no water quality data for the unnamed tributary."  AR at 654–55.  The Appeal Decision concluded there is no significant chemical connection to the Red River because:

> the [Administrative Record] does not contain data supporting flow regime, volume, duration, or frequency from the wetlands to the river.  Additionally, the District states that indicators of the transport of energy, materials, and nutrients were observed during a site visit, but there is no quantitative dat[a] given to support the finding.
>
> The District's use of the word "suggest", and "reasonable to conclude" in their descriptions of ground water influence on tributary flow implies speculation.  There were no specific facts documented that could verify these assertions.

AR 655 (footnote omitted).

#### b.  Required Action

The Appeal Decision instructed that upon remand, the District shall "provide sufficient documentation of a significant nexus on the wetlands, including an analysis of whether the wetlands have more than a speculative or insubstantial effect on the chemical integrity of . . . the Red River of the North."  Id. at 654.  The District was specifically required to "document the volume, duration, and frequency of water flow from the wetlands to the [Red River]."  Id.

### 2.  Physical Connection

#### a.  Deficiencies

As with the chemical connection, the Review Officer noted the lack of data from site observations establishing a physical connection between the Wetlands and the Red River:

> While the [Administrative Record] provides information indicating an [ordinary high water] mark for the unnamed tributary exists, it does not provide sufficient evidence to establish a significant nexus that the number of flow events, volume, duration, and frequency of water flowing through the tributary are such that it has an appreciable effect on the [traditional navigable water].  The District stated that flow was present during the site visit; however, the District could not definitively identify any type of flow present in the channel by either precipitation runoff or by groundwater flow.  Additionally, the District stated that additional site investigations would be needed to determine the site's hydrologic connectivity.

AR 658 (footnote omitted).

#### b.  Required Action

The Appeal Decision stated that upon remand, "the District will document the number of flow events per year, volume, duration, and frequency of flow events from the wetlands to the [traditional navigable water]."  AR 656.

### 3.  Biological Connection

#### a.  Deficiencies

In concluding that the Administrative Record failed to adequately support a biological connection between the wetlands and the Red River, the Appeal Decision again noted that "field assessments did not provide evidence of water flow."  AR at 659.  Further, "[a]dditional information is needed to indicate if the wetland provides any significant biological/ecological contribution to the [traditional navigable water]."  Id.

10

b.  **Required Action**

The District was required upon remand to "provide additional documentation of a significant nexus on [sic] the wetlands, including an analysis of whether the wetlands have more than a speculative or insubstantial effect on the biological integrity of the nearest traditional navigable water."  AR 658.  Specifically, the District was required to "document the hydrologic, ecologic, and other functions performed by the tributary and all of its adjacent wetlands."  Id.

F.  **Revised Jurisdictional Determination**

Following the Appeal Decision, the District consulted with a Life Scientist/Enforcement Officer from the Environmental Protection Agency ("EPA") regarding the decision.  AR 718. The EPA Officer opined that "the [Review] Officer's main point is that while the [Corps'] record has some nice generalities about headwater streams and wetlands, [because] there is little or no evidence characterizing the ditch or [unnamed tributary] 'flows', he can't say the functions matter to, connect to, or affect the [traditional navigable water] . . . .  Seems [the Corps] must monitor flow like we and they have done on other matters."  Id.  The Corps then planned to make an additional visit to the site to buttress its remand response, but was unable to do so due to weather.  AR 723–24.

On December 31, 2012, the District issued a Revised Jurisdiction Determination ("Revised JD") in which it again concluded that a significant nexus exists to support CWA jurisdiction.  No additional site evaluations were performed to reach the conclusion in the Revised JD, and no new site-specific data was added to the Administrative Record that had not already been before the Review Officer at the time of the Appeal Decision.  In response to the Appeal Decision's requirement that the Corps document the "volume, duration, and frequency"

of water flow "from the wetlands to the [traditional navigable water]," AR 654, 656, the District calculated a hypothetical range of the volume and duration of flow in the tributary by estimating the size of the tributary's cross sectional area and multiplying this figure by an assumed range of average velocities. AR 792. The Revised JD did not include any documentation or data—hypothetical or otherwise—regarding the flow of water through the 512-foot ditch that connects the Wetland Complex to the tributary.

Among the differences between the Initial JD and the Revised JD, the language in the Initial JD that the Review Officer had characterized as speculative was excised from the Revised JD and was replaced with more definitive wording. For example, the Initial JD stated that "pools in channel in December <u>suggest</u> groundwater discharge into the tributary but this contribution <u>has not been confirmed</u>," AR 428, and that "<u>additional site investigations would be required to confirm</u> [the groundwater] contribution." AR 427 (emphases added). This text was deleted from the Revised JD, which in revised form stated that the Corps made "<u>direct observations of groundwater supported pools</u> in the stream channel." AR 792 n.3 (emphases added). Similarly, the Initial JD stated: "<u>Although not verified</u>, surface flows are <u>believed to occur</u> in response to snowmelt and precipitation and <u>would most likely be present</u> between March and June and after significant precipitation events in other portions of the growing season." AR 429 (emphases added). This sentence was altered in the Revised JD to read: "Surface flows <u>occur</u> in response to snowmelt and precipitation with continuous discharges present between March and June and more intermittent discharges occurring after significant precipitation events in other portions of the year." AR 785 (emphasis added).

The Revised JD concluded that "a significant nexus exists between [the] relevant reach

12

(comprised of the tributary and its adjacent wetlands) and the Red River of the North, a

traditionally navigable water."  AR 796.

## G.  Procedural History

On January 11, 2013, Plaintiffs filed this action under the APA, seeking judicial review

of the Revised JD.  See Compl. [Docket No. 1].  The Corps moved to dismiss the Complaint and

this Court granted the motion, holding that the Revised JD was not final under the APA.

Hawkes Co., Inc. v. U.S. Army Corps of Eng'rs, 963 F. Supp. 2d 868 (D. Minn. 2013).  The

Eighth Circuit reversed, holding that the Revised JD is a final appealable determination.  Hawkes

Co.,Inc. v. U.S. Army Corps of Eng'rs, 782 F.3d 994 (8th Cir. 2015).  The Supreme Court

granted certiorari, affirmed the Eighth Circuit's holding, and remanded the case to this Court for

further proceedings.  U.S. Army Corps of Eng'rs v. Hawkes Co., Inc., 136 S.Ct. 1807 (2016).

## H.  Present Motions

The parties have now filed cross motions for summary judgment.  Plaintiffs argue the

Revised JD is arbitrary and capricious because it is based on the same administrative record that

the Corps' own Review Officer has previously found to be insufficient for supporting

jurisdiction under the CWA.  According to Plaintiffs, the Corps did not undertake any further

site investigation or provide any new data to support the conclusion in the Revised JD.  Rather,

the Corps simply used different words to describe the same evidence and reach the same

conclusion that the Appeal Decision found to be erroneous.  Plaintiffs further argue that if the

Court determines that the Revised JD is arbitrary and capricious, remand is not appropriate

because the Corps should not be entitled to yet another bite at the proverbial apple in attempting

to provide evidence to support its assertion of CWA jurisdiction.  Plaintiffs thus ask the Court to

reverse the Revised JD and enjoin the Corps from asserting jurisdiction over the Wetlands.

The Corps argues that the Appeal Decision did not require it to conduct additional field investigations or collect new data.  Rather, the Corps was entitled to rely on available hydrologic information such as the tributary's physical characteristics, predicted discharge rates in the tributary, and the Corps' seasonal stream evaluation protocol to make the significant nexus finding.  The Corps also contends that if the Court determines that the Revised JD is arbitrary and capricious, the proper course of action is to remand the matter to the agency to address whatever infirmities the Court finds.

### III.  DISCUSSION

#### A.  Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides that summary judgment shall issue "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party and draws all justifiable inferences in its favor.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).  The nonmoving party may not "rest on mere allegations or denials but must demonstrate on the record the existence of specific facts which create a genuine issue for trial."  Krenik v. Cty. of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995) (internal quotation omitted).

#### B.  Standard of Review of Agency Actions

The APA provides that an agency action may be set aside if it is "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The

district court must perform a "searching and careful" review of the administrative record to

determine whether the agency's decision "was based on a consideration of the relevant factors

and whether there has been a clear error of judgment." Downer v. U.S. By & Through U.S.

Dep't of Agric. & Soil Conservation Serv., 97 F.3d 999, 1002 (8th Cir. 1996) (quoting Marsh v.

Oregon Natural Resources Council, 490 U.S. 360, 378 (1989)). The arbitrary and capricious

standard of review "is a narrow one," and "[t]he court is not empowered to substitute its

judgment for that of the agency." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S.

402, 416 (1971). The standard requires courts to give agency decisions a "high degree of

deference," particularly when the issue is within an agency's area of expertise. Voyageurs Nat'l

Park Ass'n v. Norton, 381 F.3d 759, 763 (8th Cir. 2004).

## C. Analysis

The Corps argues that the Revised JD includes significant new information and analysis

that adequately addresses the deficiencies identified in the Appeal Decision, and that although

only one of the three attributes—physical, chemical, or biological—is needed to show a

significant nexus between the Wetland Complex and the Red River, the Revised JD has

documented that all three exist.

### 1. Physical Connection

The Appeal Decision concluded that the Administrative Record did not establish a

significant physical nexus because among other things: (1) "it d[id] not provide sufficient

evidence to establish a significant nexus that the number of flow events, volume, duration, and

frequency of water flowing through the tributary are such that it has an appreciable effect on the

[traditional navigable water];" AR 658, (2) "the District could not definitively identify any type of flow present in the channel by either precipitation runoff or by groundwater flow;" id., and (3) "the District stated that additional site investigations would be needed to determine the site's hydrologic connectivity."  Id.

### a. Flow

The Corps argues that additional site-specific documentation of flow in the tributary was included in the Revised JD to support the physical (and chemical) connection between the Wetlands and the Red River.  Specifically, the Revised JD calculated a hypothetical range of discharge rates for the tributary (i.e., amount of water moving through the tributary) by estimating the tributary's cross sectional area and multiplying the estimated area by an assumed range of velocities.  AR 792.  Based on this hypothetical range of discharge rates, the Revised JD characterized the tributary as having continuous flows in the spring in response to snowmelt and precipitation.  Id.  The Revised JD also described the Corps' seasonal stream evaluation protocol in more detail.  The Corps argues that the stream evaluation protocol was not discussed or relied upon in the Appeal Decision, and that this protocol constitutes available hydrologic information that the Corps may use to characterize the tributary's flow.

These additions to the Appellate Record do not alter the conclusions reached in the Appeal Decision.  The hypothetical discharge calculations are based on assumed variables, and thus do not remedy the lack of sufficient "evidence" regarding the number of flow events, volume, duration, and frequency in the tributary.  AR 658.  Nor do the calculations overcome the District's failure to "definitively identify any type of flow present" in the tributary by either precipitation runoff or groundwater flow.  Id.

16

Addressing the seasonal stream evaluation protocol, the Administrative Record shows that the Appeal Officer specifically considered the protocol and discussed it in the Appeal Decision.  Prior to issuing the Appeal Decision, the Review Officer requested additional information regarding the protocol.  AR 629.  The District responded by providing literature on the seasonal stream evaluation protocol and explaining:  "We readily acknowledge that this is a tool that we use and is not a definitive indicator of the flow regime of the tributary but in cases where we do not have the luxury of monitoring flow we use it to help us with these determinations."  AR 629, 632–43.  The Appeal Decision quotes the Initial JD's discussion of the seasonal stream evaluation protocol, including the Initial JD's assertion that the unnamed tributary's drainage area is "almost 2.5 times the threshold identified during the District's assessment of flow duration on first and second order tributaries."  AR 657 (quoting Initial JD at AR 427).  Thus, the Review Officer was well aware that the tributary dimensions easily satisfied the Corps' stream evaluation protocol.  Even with that knowledge, the Review Officer determined that the Administrative Record "does not provide sufficient evidence to establish a significant nexus that the number of flow events, volume, duration, and frequency of water flowing through the tributary are such that it has an appreciable effect on the [traditional navigable water]."  AR 658.

The Corps also argues that the Revised JD included an updated characterization of the flow in the unnamed tributary based on average snowfall for the area and indicators of flow observed on-site in the tributary, such as an ordinary high water mark.  None of this information is new to the Revised JD.  The Initial JD included the same average snowfall measurements as the Revised JD, and also noted the existence of an ordinary high water mark in the tributary.  See

AR 426 (snowfall amounts in Initial JD); AR 428 (ordinary high water mark in Initial JD). These items were referenced the Appeal Decision, which shows they were considered by the Review Officer.  See AR 656 ("The [Administrative Record] included documentation regarding precipitation amounts [and] snowfall amounts . . . ."); AR 658 (stating "the [Administrative Record] provides information indicating an [ordinary high water] mark for the unnamed tributary exists").  Thus, the average snowfall amounts and indicators of flow in the tributary do not constitute newly evaluated information or documentation that would change the outcome of the Appeal Decision.

The Corps further asserts that although the Initial JD included speculative language about whether the tributary is supported by groundwater, the Revised JD includes new information that enables the Corps to determine that groundwater does contribute to the tributary's assumed flow. The Initial JD stated that the observations of pools throughout the tributary in the midst of a severe drought "suggest[ed] that there is a groundwater component to the flow in the channel," but that "additional site investigations would be required to confirm this contribution."  AR 427. The Revised JD, in addition to noting the severe drought, also stated that "no precipitation was recorded during the three days leading up to the site investigation."  AR 782.  The Corps contends that the existence of the pooled water despite a severe drought and no precipitation in the preceding three days enabled the Corps to determine that groundwater contributes to the tributary.   However, the pools were "iced over" at the time they were observed in December 2011.  AR 242; see also AR 255–56 (photographs of  frozen pools).  Thus, it is not surprising that the pools persisted in the channel despite the lack of precipitation in the preceding three days.  The added fact about the lack of recent precipitation does nothing to confirm that

groundwater contributes to the tributary.

In addition to the uncured deficiencies regarding flow analysis for the <u>tributary</u>, the Revised JD provides no documentation or analysis to establish the existence or extent of the flow of water through the <u>man-made upland ditch</u> that connects the Wetlands to the tributary.[5] Documentation and analysis of water flow in the ditch is critical because the ditch "provides a discrete hydrologic connection from the wetland to the Red River" and establishes the Wetland Complex's adjacency to the Red River.  AR 651 ("While the man-made ditch along the southern border of the wetland is not jurisdictional, it provides a discrete hydrologic connection from the wetland to the Red River.  Using a non-jurisdictional ditch to establish adjacency to a [traditional navigable water] is supported by the Revised 2008 Guidance . . . .").  Because such documentation and analysis is lacking for the ditch, the Revised JD does not satisfy the Appeal Decision's requirement that the Corps document the volume, duration, and frequency of water flow from the Wetlands to the Red River.  The Review Officer determined that this documentation is necessary to establish that the Wetlands have a physical nexus to the Red River that is more than speculative or insubstantial.

### b. Flood Water Storage

The Corps also argues that the physical connection between the Wetland Complex and the Red River is established by additional documentation in the Revised JD showing the significant water storage function the Wetland Complex provides for the Red River.  The Revised JD includes information about the frequency of flood events on the Red River from

---

[5] As noted earlier, the ditch does not have a continuous ordinary high water mark, and it is unclear whether flattened vegetation in the ditch bottom is primarily due to water flow or wildlife use.  AR 250.

2001 to 2010 and explains that the Red River Water Management Board, Red River Basin Flood

Damage Working Group, and other institutions have determined that flood water storage in the

watershed's upstream wetlands is an important strategy in reducing flooding along the Red

River.  AR 794.  The District calculated a storage potential of 200 acre-feet for the wetlands in

the review area and determined that maximum storage would occur during the peak spring

flooding season.  AR 795.

This information is not new to the Revised JD.  The same points were made in the Initial

JD which, like the Revised JD, listed the frequency of Red River flood events from 2001 to

2010, noted the flatness of the Red River basin, explained that water storage in the watershed's

upstream wetlands is recognized as an important factor in reducing spring runoff and

downstream flooding, and estimated that the Wetland Complex is capable of providing over 200

acre-feet of water storage.  AR 435.  Thus, the supposedly additional information that the Corps

relies on is essentially the same information that the Review Officer found insufficient to support

a significant nexus.

## 2.  Chemical Connection

### a.  Flow

Similar to the physical connection, the Review Officer's determination that a significant

chemical connection had not been shown was based on the absence of site-specific facts and data

to support a chemical connection from the Wetlands to the Red River.  For example, "[s]urface

flows were not observed in the tributary by Corps staff," AR 654, there was "no water quality

data for the unnamed tributary," AR 655, and there were "no specific facts documented that

could verify" the Initial JD's assertion that ground water contributed to flow in the tributary.  Id.

For the same reasons as those discussed for the physical connection, the Administrative Record underlying the Revised JD does not alter the determination in the Appeal Decision that the Corps failed to provide sufficient site-specific data and facts regarding the frequency, volume, and type of flow between the Wetlands and the Red River to establish a significant chemical nexus.

### b. Turbidity, Pollution

The Corps further argues that the Revised JD establishes the significance of the chemical connection by further documenting the chemical functions served by the tributary and wetlands. For example, the Revised JD explains that the Red River is listed as impaired for turbidity by the Minnesota Pollution Control Agency, and the Wetland Complex provides a "sink" that traps chemicals, pollutants, nutrients, mercury, and sediment and prevents them from being released downstream.  See AR 796.

Again, this information is not new, as the same points were made in the Initial JD.  See AR 435 ("The wetlands in the relevant reach also trap sediments and transform and store pollutants and nutrients, which is important for downstream water quality."); AR 437 ("The Red River is listed as impaired for aquatic life and aquatic consumption . . . .  The pollutants/stressors for these impairments are mercury and PCB in fish tissue and turbidity.").  The Review Officer has already determined that this generalized information regarding the functions of wetlands in the review area is not sufficient to support a significant chemical nexus with the Red River.

### 3. Biological Connection

The Appeal Decision also concluded that the Administrative Record did not establish a significant biological connection between the Wetlands and the Red River because "field assessments did not provide evidence of water flow" and because there was "no mention [in the

Initial JD] of species being located within the tributary or wetland."  AR 659.

The Corps argues that the Revised JD provides additional information to establish a biological connection.  For example, in response to the finding in the Appeal Decision that the "District . . . did not indicate if the expansion area wetland supports any aquatic/wildlife diversity," the Revised JD states that "[t]he tributary could serve as a movement corridor between the Middle River and the wetland and upland habitats adjacent to it.  Amphibians, reptiles, and mammals all utilize stream channels as migration routes and various species of each are known to inhabit this portion of Minnesota."  AR 784.  However, the possibility that the tributary "could" serve as a movement corridor is speculative and is based on general information of the function of stream channels, rather than site-specific information.  As the Appeal Decision recognized, information regarding "the overall functions provided by stream headwaters, the similarly situated wetlands, and wetlands in general, within the review area" does not speak to "how the functions that the specific onsite wetland and tributaries have a significant nexus that is more than speculative or insubstantial on the chemical, physical, or biological integrity of the downstream [traditional navigable water]."  AR 660 (emphases added).

The Corps also contends that the Revised JD further documents the tributary's functions of providing nutrients and energy to the Red River and transforming nutrients by breaking down and transporting organic matter such as leaf litter and woody debris into forms more readily available to biota in downstream waters.  See AR 796 (discussing tributary's nutrient transportation and transformation functions).  Again, this information was included in the Initial JD but was not sufficient to establish a significant biological connection between the Wetlands

22

and the Red River.  See AR 437 (describing headwater streams' role in breaking down and transporting organic matter to support food webs downstream).  As with the Initial JD, the Revised JD notes the existence of leaf litter and woody debris in the tributary, but includes no quantitative data to support the finding that the tributary transports nutrients from the Wetlands to downstream waters.  See AR 655 ("Additionally, the District states that indicators of the transport of energy, materials, and nutrients were observed during a site visit, but there is no quantitative dat[a] given to support the finding.").  Moreover, the added documentation does nothing to address the Appeal Decision's finding that "field assessments did not provide evidence of water flow."  AR 659.

In sum, the Revised JD is based on essentially the same information and documentation that was already determined by the Review Officer to be insufficient for establishing more than a speculative or insubstantial nexus between the Wetlands and the Red River.  To the extent that the Revised JD includes additional information, the added information fails to remedy the deficiencies in the Initial JD that were identified by the Review Officer, including that: "[s]urface flows were not observed in the tributary by the Corps staff," AR 654, "there is no water quality data for the unnamed tributary," AR 655, "field assessments did not provide evidence of water flow," AR 659, "the District could not definitively identify any type of flow present in the channel by either precipitation runoff or by groundwater flow," AR 658, and "additional site investigations would be needed to determine the site's hydrologic connectivity." Id.  Because the Revised JD relies on the same factual record that the Appeal Decision has already found to be insufficient for CWA jurisdiction, the conclusion in the Revised JD that a significant physical, chemical, or biological nexus exists between the Wetlands and the Red

River is arbitrary and capricious.

**D.  Deference to Agency Expertise**

      In concluding that the Revised JD is arbitrary and capricious, the Court is not substituting its own judgment for the agency's expertise.  See Voyageurs Nat'l Park Ass'n, 381 F.3d at 763 (stating review under the APA requires courts to give agency decisions a "high degree of deference," particularly when the issue is within an agency's area of expertise).  The agency's own Appellate Review Officer determined in his expert opinion that the administrative record underlying the Initial JD lacked sufficient site-specific data and evidence to support a finding that the Wetlands have a significant chemical, physical, or biological nexus to the Red River. Because the District failed to supplement the administrative record with additional site-specific evidence and information that the Review Officer found to be necessary, the conclusion in the Revised JD that CWA jurisdiction exists is arbitrary and capricious.

**E.  Remedy**

      Having concluded that the Revised JD is arbitrary and capricious and must be set aside, the Court must next determine the proper course of action to resolve this case.  Plaintiffs argue that the appropriate relief is an injunction that enjoins the Corps from asserting jurisdiction over the Wetlands.  The Corps disagrees, arguing the proper remedy is a remand to the Corps to address the infirmities found by the Court.  The Corps contends that it would be plainly erroneous for the Court to conclude that there are no circumstances and no facts under which the Corps could establish regulatory jurisdiction, and thus Plaintiffs are not entitled to the injunctive relief they seek.

      If an agency decision is not supported by the administrative record, the general rule is

that the matter should be remanded to the agency for additional investigation or explanation.  See

Ramirez-Peyro v. Gonzales, 477 F.3d 637, 641 (8th Cir. 2007) ("Generally speaking, a court of

appeals should remand a case to an agency for decision of a matter that statutes place primarily

in agency hands.") (quoting INS v. Orlando Ventura, 537 U.S. 12, 16 (2002) (per curiam)); Fl.

Power & Light Co. v. Lorion, 470 U.S. 727, 744 (1985) ("If the record before the agency does

not support the agency action . . . the proper course, except in rare circumstances, is to remand to

the agency for additional investigation or explanation.").  This rule, however, is not without

exceptions.  See Fl. Power, 470 U.S. at 744 (stating that remand is the proper course "except in

rare circumstances").  For example, courts have declined to remand matters to an agency for "a

second bite of the apple just because [the agency] made a poor decision," particularly where

remand would make administrative law "a never ending loop from which aggrieved parties

would never receive justice."  McElmurray v. U.S. Dep't of Agric., 535 F. Supp. 2d 1318, 1336

(S.D. Ga. 2008) (quoting McDonnell Douglas Corp. v. NASA, 895 F. Supp. 316, 319 (D.C.

1995)).

        Here, the Corps already had two opportunities to establish a significant chemical,

physical, or biological nexus between the Wetlands and the Red River.  After falling short in the

Initial JD, the Corps was given a chance to supplement the Administrative Record with

additional site-specific evidence and information to support its significant nexus determination.

It did not do so.  Allowing the Corps a third bite at the apple would force Plaintiffs back through

a "never ending loop."

        The Corps has been aware of Hawkes' desire to mine peat from the Wetlands since at

least 2007, and has had years to collect site-specific information regarding CWA jurisdiction.

AR 59–61.  In 2007, Hawkes told the Corps that the peat it was currently mining would be depleted in approximately ten years, and that expanding its operations to the Wetlands was necessary to extend the life expectancy of its mining operations.  AR 61, 74.  This 10-year period has nearly elapsed, and yet the Corps asks this Court to remand the matter back to it for yet another chance to establish CWA jurisdiction.

Remand under these circumstances would fuel what the Eighth Circuit characterized as the Corps' "transparently obvious litigation strategy"—leaving Plaintiffs without an adequate remedy until "the Corps . . . achieve[s] the result its local officers desire, abandonment of the peat mining project"—without ever having to establish CWA jurisdiction.  Hawkes, 782 F.3d at 1001.  As the Eighth Circuit noted, "the uncertain reach of the Clean Water Act and the draconian penalties imposed for the sort of violations alleged in this case . . . leaves most property owners with little practical alternative but to dance to the EPA's [or to the Corps'] tune."  Id. at 1002 (quoting Sackett v. EPA, 132 S.Ct. 1367, 1375 (2012) (Alito, J., concurring) (internal quotation marks omitted)).  Plaintiffs should not have to continue to wait to mine their land while the Corps engages in a third effort to establish regulatory jurisdiction over the Wetlands.

Accordingly, the proper remedy here is to set aside the Revised JD as arbitrary and capricious, and to enjoin the Corps from asserting jurisdiction over the Wetlands.  This conclusion is not reached lightly, as the Court is aware that peat mining can have significant impacts on the environment.  However, peat mining and processing is regulated in Minnesota through permits issued by the Minnesota Department of Natural Resources, thereby ensuring that Plaintiffs' peat mining operations will not go unregulated or unchecked.  See, e.g., Minn. Stat. §

103G.231.

## IV. CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.  Plaintiffs Hawkes Co., Inc., Pierce Investment Co., and LPF Properties, LLC's Motion for Summary Judgment [Docket No. 49] is **GRANTED**;

2.  Defendant United States Army Corps of Engineers' Cross Motion for Summary Judgment [Docket No. 79] is **DENIED**;

3.  The Corps' Revised JD is unlawful and is set aside as arbitrary, capricious, and an abuse of discretion; and

4.   Defendant United States Army Corps of Engineers is enjoined from exercising jurisdiction under the Clean Water Act, 33 U.S.C. § 1251, et seq., over the Wetlands.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:


        s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  January 24, 2017.